Argued March 6; modified June 3; rehearing denied October 7, 1930

# DONAGHY *v.* OREGON-WASHINGTON R. & NAV. Co.

(288 P. 1003, 291 P. 1017)

*Roy F. Shields* of Portland (A. C. Spencer and Thos. H. Maguire, both of Portland, on the brief) for appellant.

*B. A. Green* of Portland for respondent.

McBRIDE, J. ▮ ▮ The first assignment of error arises upon the failure of the court to give defendant's request as to the assumption by plaintiff of the risks of the employment. The requests are couched in the usual language and, if this case comes under the provisions of the Federal Employers' Liability Act, United States Code Annotated, title 45, chapter 2, §§ 51-59, the refusal to give the requested instruction was reversible error. If, on the contrary, the case comes under the Employers' Liability Act of Oregon, Or. L., §§ 6785-6791, the refusal was proper. Under the federal statute, in cases of this character not arising under the safety appliances act, assumption of risk is a good defense, while in cases not embraced in that act, but included in the state Employers' Liability Act, assumption of risk is not a defense. This is conceded by both parties.

▮ A further proposition would seem to need no discussion, namely, that, if the case is one embraced in the Federal Employers' Liability Act, the State Employers' Liability Act can not be invoked. So it is important to ascertain whether the Federal Employers' Liability Act covers the case made by plaintiff either in the pleadings or evidence. In the outset, it may be stated that the complaint does not state facts sufficient to bring plaintiff's case within the provisions of the federal act, in this, that it is nowhere alleged that the defendant is engaged in interstate commerce, which fact is the very first element necessary to be pleaded in order to bring the defendant within the scope of the federal act, and there is no express aider in the answer for the reason that defendant's allegation, that it is so engaged, is denied by the reply, and an allegation in an answer which is denied in the reply can not be used

to aid or supply a material allegation in the complaint: *John P. Sharkey Co. v. City of Portland,* 58 Or. 353, 362 (106 P. 331; 114 P. 933). So there is nothing in the pleadings, as they stand, which would support a judgment on proof of facts bringing plaintiff within the purview of the federal act, but the defense that the plaintiff was injured while engaged in interstate commerce would have the effect, if proved, of defeating a recovery under the state Employers' Liability Act: *Frazier v. Hines,* 260 Fed. 874; *Panhandle & S. F. Ry. Co. v. Brooks,* (Tex. Civ. App.) 199 S. W. 665; *Peek v. Boston & M. R. R. Co.,* 223 Fed. 448; *Flanders v. Ga. Southern & F. Ry. Co.,* 68 Fla. 479 (67 So. 68). This brings us to the critical point in the case. If the defendant has shown from the facts proven that this case is within the purview of the Federal Employers' Liability Act, the case must be reversed by reason of the court's refusal to give the requested instruction in regard to assumption of risk, which defense is clearly admissible under that statute.

■ It is a complicated question, and the writer has considered carefully the many federal decisions on the subject, which decisions are controlling here.

The Supreme Court of the United States in the case of *Shanks v. Delaware Lackawanna & Western Railroad Co.,* 239 U. S. 556 (36 S. Ct. 188, 60 L. Ed. 436, L. R. A. 1916C, 797), has prescribed a test which on the face of it seems easy. It is this, "was the employee at the time of the injury engaged in interstate transportation or in work so closely related to it as to be practically a part of it." The "test" is no doubt a correct one on paper, but to quote Captain Jack Bunsby of humorous fame 60 years ago, "The bearings of this observation lays in the application of it." When

is the work of the employee "so closely related to interstate transportation" as to be practically a part of it? And here the courts are like a ship at sea without a compass, or a glider in the air with a fluctuating breeze. The highest court of the nation declares that it is impossible to lay down a hard and fast rule by which the test may be concretely applied to all cases; that the facts of each case must be considered by themselves in determining whether they bring the injured employee within the test which bring the employee within the prescription that requires his work to be "so closely related to interstate commerce as to be practically a part of it." This sometimes is a matter for fine distinctions. In the many federal cases, which we have examined, we are struck by the circumstance that it has seemed to be a desire on the part of our highest court to construe the law liberally in favor of the injured workman, and this is proper and humane. Many states have very defective and sometimes no employers' liability laws, often leaving the employee to pursue his remedy under the archaic rules of the common law which subjected him to all the penalties of contributory negligence. Congress, in an effort to eliminate these hardships, saw fit to pass the present federal statute, which eliminated to an extent the common law rule in regard to contributory negligence, and permitted a rule of comparative negligence to be applied, and which allowed the evidence of contributory negligence of the injured party only to the extent of reducing the amount of his recovery. But, in cases not arising under facts showing disregard by the employer of the safety appliances act, it left to the defendant the right to urge assumption of risk on the part of the employer. In many, and perhaps the majority of cases,

this was a boon to the employee, but compared with the state Employers' Liability Act, which coincides practically with the federal act as to contributory negligence, but goes beyond it by abolishing the defense of assumption of risk, it is plain that the state statute is the preferable remedy in cases where it does not conflict with the federal statute.

■ We come now to a discussion of the facts bearing upon the question as to whether the plaintiff was employed in interstate commerce when the injury occurred. The defendant owned and operated a railroad engaged in both interstate and intrastate traffic. Incidentally, and as a part of its machinery in keeping its track, which extends from Portland easterly and beyond the boundaries of the state, it owned and used the crane described in the complaint. In lifting a heavy load at Deschutes in this state, the crane became damaged and out of repair and was sent to the company's shops in Portland for the necessary rehabilitation. The crane came into the shops on December 5, 1927, and its condition, at the time of the accident, a few days later, which was the first time that the plaintiff became engaged in its reconstruction, was about as follows: The header casting had been taken off, the boiler was taken out, the flues were taken out of the boiler, the header casting was broken; and the bushing or sleeve, the fall of which caused the injury, had been subjected to a test to determine its soundness. In fact, the repairs necessary would seem to have been almost a reconstruction of many, if not most of the vital parts of the machine and the time for such repairs seems to have consumed a period of 42 days, including the day of the accident, before they were completed and the machine was again fit for and placed in service.

The present is not a case of mere temporary delay, as where a car is halted for a temporary repair and shortly thereafter resumes its journey, a case of "off again, on again, gone again," but of a distinctive withdrawal from service similar to the conditions suggested in the case of *State Industrial Accident Commission of California v. Davis*, 259 U. S. 182, 187 (42 S. Ct. 489, 66 L. Ed. 888), wherein the court uses this language:

"We refrain from a review of our cases. They pronounce a test and illustrate it. We are called upon to apply it to the present controversy. The federal act gives redress only for injuries received in interstate commerce. But how determine the commerce? Commerce is movement, and the work and general repair shops of a railroad, and those employed in them are accessories to that movement, indeed, are necessary to it, but so are all attached to the railroad company, official, clerical or mechanical. Against such a broad generalization of relation we, however, may instantly pronounce, and successively against lesser ones, until we come to the relation of the employment of the actual operation of the instrumentalities for a distinction between commerce and no commerce. In other words, we are brought to a consideration of degrees, and the test declared, that the employee at the time of the injury must be engaged in interstate transportation or in work so closely related to it as to be practically a part of it, in order to displace state jurisdiction and make applicable the federal act. And there is a difference in the instrumentalities. In some, the tracks, bridges and roadbed and equipment in actual use, may be said to have definite character and give it to those employed upon them. But equipment out of use, withdrawn for repairs, may or may not partake of that character according to circumstances, and among the circumstances is the time taken for repairs—the duration of the withdrawal from use. Illustrations readily occur. There may be only a placement upon a sidetrack or in

a roundhouse—the interruption of actual use, and the return to it, being of varying lengths of time, or there may be a removal to the repair and construction shops, a definite withdrawal from service and placement in new relations; the relations of a work shop, its employments and employees having cause in the movements that constitute commerce but not being immediate to it.

"And it is this separation that gives character to the employment, as we have said, as being in or not in commerce. Such, we think, was the situation of the engine in the present case. It was placed in the shop for general repairs on December 19, 1918. On February 25, 1919, after work upon it, it was given a trial and it was placed in service on March 4, 1919. The accident occurred on February 1st of that year, the engine at the time being nearly stripped and dismantled. 'It was not interrupted in an interstate haul to be repaired and go on': *Minneapolis & St. Louis R. R. Co. v. Winters,* 242 U. S. 353, 356; *Chicago, Kalamazoo & Saginaw Ry. Co. v. Kindlesparker,* 246 U. S. 657."

Bearing upon a similar situation is the case of *Shanks v. Delaware, Lackawanna & Western R. R. Co.,* 239 U. S. 556 (36 S. Ct. 188, 60 L. Ed. 436, L. R. A. 1916C, 797), where an employee in the machine shops of the railroad company was engaged at the time of his injury in taking down and putting in a new location an overhead countershaft through which power was communicated to some of the machinery used in the repair work, repair work on locomotives being part of his usual employment, it was there held that such work was not so closely related to interstate commerce as to come within the purview of the Federal Employers' Liability Act.

The case of *Delaware, Lackawanna & Western R. R. Co. v. Yurkonis,* 238 U. S. 439 (35 S. Ct. 902, 59 L. Ed. 1397), presents a condition where the defendant in error, plaintiff below, was employed by an interstate railroad

company to mine coal to be used on its locomotives, employed in such commerce, and was injured in the course of such employment. It was held that the mining of the coal for the purpose indicated was not so closely related to interstate commerce as to render the plaintiff an employee engaged therein. On the other hand, in *Pedersen v. Delaware, Lackawanna & Western R. R. Co.*, 229 U. S. 146 (33 S. Ct. 648, 57 L. Ed. 1125), the plaintiff, an employee of an interstate and intrastate road, was on his way to repair a bridge on said road and was carrying a sack of bolts to be used for that purpose and while walking along the tracks on his way to the bridge was run over and killed by an interstate train. It was held by the court, Justices Lamar, Holmes and Lurton dissenting, that his employment was so nearly related to interstate commerce as to be included within the provisions of the act. But, mark the distinction between this case and those above cited, the plaintiff was in the employ of the defendant for a purpose which required him to be upon the road and to make repairs immediately necessary to facilitate current transportation; the bridge was not withdrawn from the functions as a link in interstate commerce, and the injured party was acting within the scope of his employment on his way to make imminent and necessary repairs. Vastly different conditions from the instant case where the machine had been withdrawn from its functions, removed from the activities of commerce for repairs and change which events show consumed several weeks. Even under the conditions present in the Pedersen case, the decision was not rendered without a spirited dissent from three of the justices, which indicates the fine distinctions made in these cases. As indicating the class of cases where the Federal Employers' Liability Act has been held by the Supreme Court of the United States to be

applicable, in addition to the cases last cited, we may cite the following: *Walsh v. N. Y., N. H. & Hartford R. R. Co.,* 223 U. S. 1 (32 S. Ct. 169, 56 L. Ed. 327, 38 L. R. A. (N. S.) 44), where a car repairer was replacing a drawbar on a car *then in use* in interstate commerce; *Norfolk & Western Ry. Co. v. Earnest,* 229 U. S. 114 (33 S. Ct. 654, 57 L. Ed. 1096), where a fireman was walking ahead of and piloting through several switches a locomotive which was so moving in order to be attached to an interstate train; *St. Louis, S. F. & Texas Railway v. Seale,* 229 U. S. 156 (33 S. Ct. 651, 57 L. Ed. 1129), where a railway clerk was on his way through a railroad yard to meet an interstate freight train to mark the incoming cars so that the switching crew would know what to do with them when breaking up the train; and *North Carolina R. R. v. Zachary,* 232 U. S. 248 (34 S. Ct. 305, 58 L. Ed. 591, 33 Ann. Cas. 159), where a fireman having prepared his engine for a trip in interstate commerce, and being about to start on his run, was walking across adjacent railroad tracks on an errand consistent with his duties and was injured by an incoming locomotive.

We cite these cases in order to show that in each one of them the parties injured were actively engaged in furthering active interstate commerce, either by repairing the road over which it was carried, or repairing the instrumentalities on the road upon which it was carried. We find no case in the United States Supreme Court in which, when the instrumentality was removed from transportation to a shop so withdrawn from transportation or its adjuncts as here, where a person so injured has been held to have been employed in interstate commerce; but, on the contrary there is the Shanks case, supra, the Yurkonis case, supra, and par-

ticularly the case of *State Industrial Accident Commission v. Davis,* supra, which is the last utterance of the nation's highest court on this subject, and which we follow here.

This is a federal question and the decisions of the highest federal court are conclusive upon this court, and it would be useless for us to attempt to substitute our own ideas for those of that court upon a federal question, even if we differed from its opinion which we do not in this instance.

The circuit court was correct in its conclusion that the state Employers' Liability Act applies to this case and that it follows logically that the requested instructions are properly overruled. In coming to this conclusion, we do not cite the decisions of the various inferior federal courts, although we have carefully examined a large number of them, but, finding them so largely variant in their conclusions, we only cite those of final conclusive authority. To discuss all or any large portion of the decisions of the lesser federal courts, would prolong this opinion to impracticable length. Taking the case then as one coming under the state Employers' Liability Act, we examine the alleged errors relating to that view of the case.

■ The second assignment of error is predicated on the failure of the court to give the following instruction requested by defendant:

"The defendant is not required under the law to exercise such care that it virtually guarantees the safety of the plaintiff. It has discharged its legal obligation to him when it has exercised ordinary care under the circumstances in providing a place of work and such appliances for the work as are reasonably safe and suitable for the uses to which they are put. Hence, unless you find in your consideration of the evi-

dence in this case that the defendant company failed and neglected to use such reasonable precaution and failed and neglected to furnish such reasonably safe and suitable place, facilities and appliances in which and with which the plaintiff should work, as prudent persons in the same line of work would have used and furnished under the existing circumstances, then your verdict should be for the defendant.''

While this instruction might have been good, if the case had been under the common law or the federal act, it was faulty as applied to this action under the Employers' Liability Act and, indeed, we do not understand that defendant's counsel so contend.

The third assignment is one of some difficulty. The assignment, to use the language of defendant, is as follows:

''The court erred in instructing the jury that mitigation of damages on account of contributory negligence on the part of the plaintiff was optional with the jury.''

Section 6790, Or. L., being a part of our Employers' Liability Act, is as follows:

''§ 6790.  Contributory Negligence Not a Defense. The contributory negligence of the person injured shall not be a defense, but may be taken into account by the jury in fixing the amount of the damage.''

In the construction of this clause of the statute, this court has uniformly construed the word ''may'' in this section to import a duty on the part of the jury to take into consideration any evidence importing contributory negligence, if such contributory negligence was found to reduce plaintiff's damages to such sum as in their judgment the circumstances might justify: *Filkins v. Portland Lumber Co.*, 71 Or. 249 (142 P. 578); *Sonniken v. Hood River Gas & Electric Co.*, 76 Or. 25 (146

P. 980); *Tabor v. Coin Mfg. Machine Co.*, 85 Or. 194 (166 P. 529). It is a general rule that, where the rights of parties are concerned, the word "may" is to be construed as "must," and it has been so held by this court in the cases above mentioned.

In the instant case, the jury was properly instructed, in effect, that if they found that negligence of the defendant produced the injury, but if negligence of plaintiff also contributed to the injury, they should take that fact into consideration in fixing the amount of damages. At the risk of prolixity, we give the whole instruction of the court on this subject:

"Defendant has alleged contributory negligence on the part of the plaintiff. I instruct you that the burden shifts at this point, and it is incumbent upon the defendant to prove by a preponderance of the evidence that the plaintiff was guilty of such negligence, and I instruct you that under the law contributory negligence of the plaintiff, if you find he was guilty of contributory negligence, is not an absolute bar to plaintiff's recovery, but may be considered by you in assessing your damages to the plaintiff, if you find plaintiff is entitled to recover damages. And with reference to that I say that this particular work, as I said before, comes under what is known as the employers' liability act, and in that act contributory negligence may not be treated as a complete defense. That is the reason I have just made the statement of the law which you have heard. But it may be set up by the defendant so that the jury may consider the same in determining the amount of damages, if any, it may find the plaintiff entitled to.

"With reference to the negligence claimed, I call your attention to these acts which the defendant claimed were acts of negligence on the part of the plaintiff, and if you find that there were two ways in which plaintiff could have applied pressure upon the plank which he was using as a lever in the work in

which he was engaged at the time of the injury, and that one way was safe and the other way dangerous or less safe, and the risks and dangers of the latter were apparent or known to the plaintiff, then it was his duty to himself as well as to the defendant to apply such pressure in the safe way even though the safe way might be more laborious than the other; and if he selected the dangerous or less safe way and sustained the injury complained of as a result thereof, in that case the plaintiff would have been guilty of contributory negligence. And if you so find, I would instruct you with reference to that defense that under the act referred to, the contributory negligence of plaintiff does not defeat his right of action to recover, but is a matter that you should take into consideration in mitigation of damages, if any, that the plaintiff is entitled to recover.

"If you find that the defendant was negligent in some one of the respects alleged in the complaint, and that such negligence of the defendant was the proximate cause of the injury, and you also find that the plaintiff was himself negligent, which negligence of the plaintiff also contributed to the injury, then you should consider the plaintiff's negligence and reduce or diminish the damages which you may find, if any, that the plaintiff has sustained, to the extent that the plaintiff's negligence has contributed thereto, if you find it did so contribute. * * *

"The supreme court in the case of *Wallace v. P. R. L. & P. Co.*, it was then 103 Oregon, seems to still call the sole negligence of the plaintiff contributory negligence. That is, it is said in that case that the defendant did not have to admit any negligence in order to plead contributory negligence. But I will say to the jury now, that has not been covered, and I thought it was here, that if you find that this injury resulted from the sole negligence of the plaintiff, then he could not recover in this cause, because he is claiming a right to recover on account of the alleged negligence of the defendant. Of course, if you are satisfied by a preponderance of the testimony that his negligence alone

caused the accident, then there was no negligence on the part of the defendant, and he has not carried the burden of proof, as I have given you instructions about before.

"I will try to make that plain again. You know we had in law originally, if I may elaborate a little bit, before the employers' liability act, the common law as we called it, and some of the states have it yet, the theory that when a plaintiff charges the defendant with negligence in a lawsuit, and the defendant then wants to lay the blame on the plaintiff, that he had to, if he wanted to say the plaintiff was negligent and that led to his injury, he had to admit some negligence on his part before he could say the plaintiff was guilty of contributory negligence.

"That situation does not occur in this state. The plaintiff in this state can charge a defendant with negligence, and the defendant has a right to deny that he was negligent at all, but to assert that the incident or accident, or the injury occurred from the sole negligence of a plaintiff. That is what was done in this case.

"Now, in common law, if the plaintiff was solely negligent, or if his negligence contributed, even, to the injury, he could not recover at all. He was out. But under the employers' liability law, they modified that to the extent I have heretofore outlined. It is not a complete defense, that is, his own contributory negligence is not a complete defense, but it is to be considered by you if and when you come to the question of assessing damages, in determining what, if any amount, he is entitled to, considering the fact, if you find it to be a fact, that his negligence contributed to the injury.

"Putting it another way, if you find that he was not guilty of negligence at all, and you should find that the defendant was guilty of some of the acts of negligence, then you might say the plaintiff was entitled to recover a certain sum. Then if you had a case where the plaintiff was guilty of an act of negligence that contributed,

and but for that contributory negligence you think that he was entitled to the sum you had in mind first, then it would be your duty to reduce what you might originally have found if the negligence was solely that the defendant, by virtue of the fact that the plaintiff was guilty of contributory negligence. That seems to be the effect of the law. That is, you consider his contributory negligence if passing on the question of damages. I hope I have made that clear to you.

"Mr. Green: The law specifically says 'may.' The law uses the term 'may' in section 6785.

"The Court: Did I say 'must'?

"Mr. Green: Yes.

"The Court: I will read it to you from the book 'The contributory negligence of a person injured shall not be a defense, but may be taken into account by the jury in fixing the amount of the damages.' All right."

■ ■ The instruction quoted, taken as a whole fairly stated the law as held in this state, namely, that it was the *duty* of the jury to take contributory negligence, if any, of plaintiff in the process of adjusting damages; but when, at the suggestion of counsel for defendant, the court read the words of the statute without explaining to the jury that the word "may" therein should be construed as "must," it had the appearance of a correction of the preceding instruction, and of leaving the jury free to disregard plaintiff's contributory negligence, if any. In other words, it had the appearance of correcting his previous instruction by eliminating the mandatory intent of the law and leaving the jury free to use their own discretion as to whether or not they would consider evidence as to plaintiff's contributory negligence, and in this respect it was erroneous. We shall consider this error in another aspect later.

14. The fourth assignment is predicated upon the giving by the court of the following instruction:

"It is further a question of fact for you to determine whether or not it was negligence for the defendant to carry on the operation in the manner in which they did carry it on, without the use of a chain block, if you find a chain block could have been used without impairing the efficiency of the work. But, I instruct you that defendant, under no condition, would be compelled to use such a method of lifting said casting into said place if the method would impair the efficiency of the work. But, if one or more of the methods alleged in the complaint was a safe method, and could have been used, without regard to the additional cost, then I instruct you that it was negligence for the defendant to fail to use the safe method. And, if you find that the said defendant company adopted and used an unsafe method, when a safe method was open, provided this safe method would not have impaired the efficiency of the work, and irrespective of how much the safe method might have cost, then the failure to use the safe method, if you find that the defendant did so fail to use a safe method, would be negligence on the part of the defendant."

We fail to see any error in the instruction. It is true that it might have been made technically clearer perhaps, but the whole effect of it was, that it was the duty of defendant to use a safe method, if the use of such method would not impair the efficiency of the work, and taking the instruction as a whole, the question as to whether the method actually used was a safe or comparatively safe method was sufficiently left to the jury.

■ Before considering the remaining objections, it may be proper to refer more particularly to the circumstances and situation of the parties at the time and immediately preceding the accident. It is a difficult,

if not an impossible task for a nonexpert to so picture the situation as to give an axact idea of it to one who has not actually seen it. It is easy to see an airplane in actual operation but difficult to describe it in writing so that a reader, who has never seen an airplane, except as it soars over his head, will have any accurate idea of its mechanism. The general description of the machine and its physical condition has already been mentioned. It rests on a car or platform which has wheels suitable to run on a railroad track. It is a trench approximately three feet deep and its width is about 46 inches so that an ordinary car or locomotive can be run over it for the purpose of enabling workmen to get underneath. It is floored and lined with cement. The crane was placed over the pit and a heavy plank three inches in thickness was placed under the center of it extending from one side of the pit to the other. The object of the labor of these men was to lift a bushing, eight inches in diameter and approximately three feet high and weighing 275 pounds, perpendicularly through a hole in the floor of the crane so that its whole length would be inside of the body of the crane or a casting made to contain it. The bushing was for the purpose of holding the drive shaft of the machine so that it would not wear out the main casting of the crane, and clear through it from top to bottom was a hole 3 3/8 inches in diameter in which the driveshaft moved up and down. When the defendant, with his immediate boss, Mr. Mueller, went down into the pit, the bushing was on the floor and it was desirable to lift it endways up on the pit plank, before mentioned, putting one end into the hole in the floor or casting of the crane and allowing it to rest on the pit plank for further operations. Finding that the strength of two

men was not adequate to place the bushing in the desired position, a third man was called by the machinist, Mr. Mueller, who assisted them to the extent that the bushing was lifted up so that the upper end was inserted in the hole in the crane and the lower end was left resting on the pit plank. The second helper left or was dismissed after the casual assistance in getting the bushing up on the pit plank and Mueller and plaintiff, who was his helper and subject to his directions, started to complete the job of lifting the bushing so that its lower end would be flush, or comparatively flush, with the floor of the crane. Under the directions of the machinist, Mueller, plaintiff was told to get one large block 12 x 12 inches and 30 inches high and some smaller blocks and throw them down in the pit and also a small jack 11 inches high when closed and 15 inches when opened, which he did, and placed them in the pit, Mueller remaining in the pit to manipulate the blocks, and the jack process as near as can be inferred from the testimony was this: plaintiff on the floor of the shop had a pry, a board eight feet long which he placed either under the edge of the bushing where it projected beyond the pit plank or upon a nut or set-screw that projected from the edge of the bushing beyond the pit plank and using 6 x 6 block as a fulcrum lifted the bushing up perpendicularly farther into the crane, perhaps two or three inches, and held it in that position until the machinist, Mueller, in the pit removed the pit plank and placed in position a 12 x 12 block 30 inches high and a jack 11 inches high and a block 4 x 4 on top of the jack, then working the jack, which worked up and down like a pump handle, he raised it with the block on top of it until the block came up snug or practically so with the bottom of the bush-

ing when he gave a signal to the plaintiff to ease up on his pry so that the bushing could settle down solidly upon a support consisting of three segments, the block, then the jack, then the 12 x 12 x 30 block, which would allow plaintiff to take another "bite" with his pry board for further lifting the bushing. After the pit board had been removed a piece of timber 3 x 3 x 22 inches long was placed on the inner end of the pry board in a perpendicular position so that instead of the pry board being against the edge of the bushing the end of this 3 x 3 x 22 timber came against the bushing, the lower end of the timber resting on the inner end of the pry board below. With this arrangement another signal to press down on the pry board would be given by the machinist to plaintiff, who would press down on his end of the pry thereby lifting the 22-inch timber against the edge of the bushing and raising the bushing slightly, whereupon the jack with the block on top of it was worked until the block came up to the bushing and a signal was given plaintiff to ease up the pry so that the bushing could rest down on the block, which was supported by the jack which in turn was supported by the 12 x 12 x 30 block resting on the floor of the pit. The plaintiff testified that when he received the signal to press down on his pry, he pressed down his end until it touched the floor, being at right angles to the bushing and pit, and held it in position until told to release it by getting down on his hands and knees on the floor of the shop and holding on to his pry board with a hand on each side, and that while he was holding his end of the pry board down as stated, the supports "buckled" and the bushing fell down on the inner end of his pry board, the great weight of the bushing falling causing his end of the lever to fly up and strike him on the jaw

inflicting the injuries of which he complains. That the supports buckled, causing the casting to fall, and that such fall caused the pry board to fly up and injure plaintiff is substantially admitted. The reason for the buckling of the support seems to be the gist of the controversy, plaintiff contending that it was by reason of the many negligent acts and omissions of the defendant, and the defective and negligent manner in which the work was done, and the defendant contending that the work was conducted in the safest manner practicable and that the accident was caused wholly by the negligent and careless act of the plaintiff in that instead of holding the pry down with his hands, he carelessly stood upon it thus allowing it to swing and knock against the supports thus causing them to buckle. The foregoing may not be an accurate description of the situation, but the writer thinks it is as accurate as can be made under the circumstances.

A model, which is clearly but a mere approximation of the crane, was exhibited to the jury and, under the manipulation of witnesses, who were more or less expert in the matter, no doubt aided them in getting correct ideas of the situation, and this model was brought here with the transcript and referred to in the argument, but in a way that falls far short of making the court familiar with its operation for the references of the witnesses were indefinite in many particulars. For instance, in the testimony of one witness, this occurs: ''That was steel plates that was in the casting right in *here* (evidently referring to the model). The old ones were removed and new ones applied, they were set on a position like that (indicating).'' Neither the question nor this answer were particularly important, but we take the first instance that comes to hand, and

there were several such, to show the difficulty without physical demonstration of ascertaining from the transcript where "right in here" and "about in this position" mean to a member of this court, who of course had no opportunity to see a physical demonstration. Although the writer worked for nearly half a day to reconstruct the situation by means of the model, that contraption remained about as intelligible as a Chinese puzzle and he has relied mostly on the oral testimony to give an imperfect and only approximate statement of the situation, which at best gives only a general idea, but which, in the writer's opinion, is sufficient to illustrate the general facts.

The plaintiff's evidence tended to show that the lights in the shop were not bright and that the pit was insufficiently lighted so that he was unable to see through the framework of the crane in front of him what Mueller was doing in the pit. There was also evidence that other workmen were cutting the flues out of the boiler of the crane, which was lying about 10 feet from where plaintiff and Mueller were working; that they were using an airgun or chipping gun for that purpose, the impact of which would make considerable noise; that boilermakers were working on locomotives on adjacent or nearby tracks on each side so that the noise was such that he was unable to hear signals given orally, but had to depend on signals given by Mueller by putting out his hands, and that when he left the pit to go to his prying work, Mueller told him that if he could not make him hear his voice that he would signal with his hands. Mueller denied this on the stand, but in the written report made by him on the day of the accident he stated:

"We were putting up barrel for reversing gear on Crane 0295 when blocking slipped and the blocking

struck him under chin that he was prying with, the noise at the time was so that he could not hear me when he was called to. It knocked out some teeth and broke his glasses.''

According to the weight of evidence, the conditions of the work were peculiar. The day was dark, cloudy and rainy and the light from the windows was only sufficient to create a sort of twilight time in the vicinity where plaintiff and Mueller were working, at least not sufficient to enable plaintiff to see from the outside what Mueller was doing in the pit with reference to arranging the blocking and manipulating the jack. In that respect he was dependent on the care and vigilance of Mueller to warn him and take care that he received the warning. It is true that he had worked in the shops for several years, but, so far as the evidence shows, always as a helper. What he knew about the technical methods used in repairing a crane, or whether he had had any great experience in that sort of work, does not appear. Locomotives and cars are likely to come in every day, but it may have been seldom that a machine of this character had come to plaintiff's attention. His general experience as a helper may have made him familiar with the general practice in such cases, but not with the constantly changing conditions. Mueller was not in a position to efficiently warn him. He was required to look after the blocking, to manipulate the jack and see that the proper blocks were placed; and in view of the noise and insufficient light and the impossibility of plaintiff being able to see the conditions in the pit, we are of the opinion that it was negligence for the defendant to have attempted to conduct the work without having another man in the pit to give signals and see that plaintiff got them. The work as conducted was highly

dangerous. The means employed seem to us to have been primitive and, to use the homely expression, "shackling." A jack 11 inches high set upon a block 30 inches high, with a block on top of the jack would seem a very insecure foundation upon which to rest a weight of 275 pounds, and we think the jury were justified in believing that a safer and better method could have been used, and, certainly, no more unsafe method could have been used. Other methods are suggested in the evidence and it was for the jury to judge whether they were safe, or more safe than the aggregation of blocks placed one upon another which were actually used.

■ There was some evidence tending to show contributory negligence on the part of the plaintiff. One witness testified that he saw plaintiff holding his pry plank down by standing upon it, instead of holding it down with a hand on each side of it, and it is plausibly suggested that this method might have permitted the pry to swing around and the end of it, which was in the pit, might have struck the blocking thus causing it to buckle. Such an inference might have been drawn, had the jury been clearly instructed that it was their duty to consider the evidence of contributory negligence for what it was worth, instead of leaving it to their discretion to lay aside, or consider contributory negligence as they might see fit. We do not pass upon the weight of this evidence and there are some circumstances in the case which might tend to show its inaccuracy, but considering the contradictory instructions on this subject, we can not, nor could the court below, know whether they considered the evidence in regard to contributory negligence and reduced the damages on that account from a larger sum, which they would otherwise have

given, or whether they laid it outside of their deliberations entirely. It should be remembered that the instruction complained of was the last instruction given on this subject. No doubt the remark of counsel emphasized it in the minds of the jury and weakened, if not destroyed, the force of the previous instruction.

The instruction in regard to warning was technically correct as a matter of law. It was based upon a rather imperfect pleading and slight testimony as to plaintiff's need for warning as to the dangers incident to shop work, as it appears that he had worked in some capacity in these shops for several years as a machinist's helper, but whether he worked on this particular class of work does not appear. It appears, incidentally, that during these years he had been a mere helper, he was not promoted to independent charge of work, which fact would indicate that his skill in shop work was not a high order. He is apparently one of that large class of workmen, who, while faithful and useful in their place, are content to do what their superiors direct them to do, trusting to the superior judgment of "the boss" that he will direct the work to be done in a way that involves the minimum of danger. In the situation of business in this age, where the applications for employment, especially in positions connected with railway service or machine shops are many, usually exceeding the demand, a man having a steady job is naturally adverse to attempting to dictate to or advise his superiors as to how they shall conduct the work he is called upon to perform, or to suggest that they ought to substitute methods which, in his opinion, are safer and better. He fears he may be told that, if the way of his superiors in executing the work does not suit his ideas, he may go to some other employer, and, in the press for employment, that other employer is difficult

to find. So the courts are more and more, and properly, reluctant to hold an employee liable because he fails to demand better conditions, methods or appliances, although we think it highly improbable that the jury would consider that the failure of the employer's agents to give plaintiff a general warning as to the dangers attending the work of repairing cranes or their adjuncts would cut any particular figure, or that they might consider that, in a plan suggested by the machinist and concurred in by the foreman in charge, where conditions were not uniform, a special warning might be necessary. The fact that he was placed where he could not see what measures were being taken in the pit as to the manner in which the blocks were being placed, or their number or length, might in the opinion of the jury require more continued and repeated warnings as the work progressed even to an employee possessing skill in this particular class of work.

Not to prolong this discussion further, we find nothing in the errors assigned that might have worked to the injury of the defendant, except the single one, which left to the jury the discretion as to considering the alleged contributory negligence.

The writer, speaking for himself and not for the court, is of the opinion that, in a case where the verdict is so outrageously beyond the proven facts as on its face to indicate passion or prejudice, and, especially, where impassioned and demagogic appeals to the jury would have a tendency to arouse passion or prejudice, the courts have a right to set aside a verdict, but such is not this case. The trial was conducted apparently as lawyers should conduct trials; indeed, this disposition to so try the case called forth an encomium from the judge at the close of the trial. The evidence indicated that the plaintiff was very severely injured, and

that there is a prospect that he may recover to some extent a limited working capacity. The hearing of one ear is destroyed, his jawbone was broken and at the end of a year and a half it had not reunited so that at the time of his trial he had not been able to eat food that required mastication. His weight had diminished 26 pounds since his injury, and he was not a heavy man before the injury. He was earning $1,320 a year in the shop, and, as a trombone player, he was earning in the evenings about $1,200 a year. It is doubtful whether the jawbone will ever reunite, and it seems certain that if it does he will be subject to some facial disfigurement, and in addition to this there is the item of physical pain, which, of course, can not be exactly computed, but for which the jury may allow reasonable compensation.

We find no evidence of passion or prejudice in the case, and, but for the error above mentioned, which eliminated one of the factors upon which the jury should have been instructed positively in determining whether defendant was guilty of contributory negligence, or whether the contributory negligence of the plaintiff contributed to his injury, we should be inclined to affirm the judgment. But the error is there and the problem, under the circumstances, is how to dispose of the appeal.

It has now been two years and a half since this injury occurred, and more than a year since this case was heard in the lower court. If sent back for another trial, it is altogether probable that more than another year would elapse before it would come back to this court.

Section 3c, article VII of our Constitution, as amended in 1910, authorizes this court, where error has been committed in the lower court, to reexamine the

case on the facts on appeal and to enter such judgment as seems equitable under the circumstances. So far as practicable, we feel inclined to follow the judgment of the jury in the present instance, but, in view of contradictory instructions, we have no means of knowing whether they took into consideration the alleged negligence of plaintiff, or laid that evidence aside on their deliberations, or rejected it as unsatisfactory, or, if accepted, whether they concluded that the fact, if it was the fact, that he stood upon the pry board and held it down, contributed to the injury. Conceding for the purpose of this case, that there may have been some contributory negligence by plaintiff, we do not think that the evidence is of such a character as to indicate there is evidence that it was the sole cause or even the preponderating cause of the injury, although it may have contributed in some. degree thereto. On account of this, we set aside the judgment below and deduct from it $5,400 as the extent of plaintiff's alleged contributory negligence and direct that a judgment be here entered for the sum of $25,000 and costs in the court below, neither party to recover costs on this appeal.

COSHOW, C. J., and RAND and ROSSMAN, JJ., concur.

---

Rehearing denied October 7, 1930

On Petition for Rehearing
(291 P. 1017)

COSHOW, C. J. ■ Appellants have filed an earnest and urgent petition for rehearing. The original opinion was written by the late Mr. Justice McBride June 3, 1930. The petition for rehearing complains principally of the amount of the damages awarded and alleges among other things that the opin-

ion mentioned the deafness referred to in the original opinion as indicating the learned justice relied on that as an item of damages. There is no issue in the pleadings on that alleged injury. Defendant argues persuasively that this case is not a proper case for this court to retry.

Petitioners earnestly contend that a new trial should be granted because of the error found in the instruction as noted in the opinion. The opinion shows that the justice examined the case with great care. It evinces that the issues were considered in detail. Every contention advanced by the petitioners, excepting the item of deafness, was carefully and painstakingly examined and passed on in the original opinion. The item of deafness appears in the evidence as follows:

"Q. Mr. Donaghy, I will ask you to state whether or not you have suffered any other disabilities than those you have mentioned subsequent or after your injury. A. Yes, I am deaf in my left ear, can not hear with my left ear."

Neither the question nor the answer was objected to. Whether or not the item of deafness added to the damages allowed by the jury and allowed by this court is problematical. At any rate the circuit judge was not called upon to rule on that question. No error could be predicated upon the question or answer on the appeal. Defendant waived the error by not objecting to the question or moving to strike out the question and answer.

We are of the opinion that the damages allowed are not excessive. We also are of the opinion that it was a proper case for this court to pass upon under the constitution. The original opinion is adhered to. The petition for rehearing is denied.

RAND, ROSSMAN, JJ., concur.